# DECLARATION OF ZABDI J. SALAZAR ON ADELANTO IMMIGRATION COURT BOND OUTCOMES AND RECORDED BOND AMOUNTS

I, Zabdi J. Salazar, do depose and state:

## INTRODUCTION

1. I am a Ph.D. candidate in Jurisprudence and Social Policy at Berkeley Law, where I conduct empirical analysis of immigration adjudication using EOIR administrative case data.
2. For this declaration, I analyzed EOIR bond records from the Adelanto Immigration Court before and after November 10, 2025. The analysis focuses on whether Adelanto bond outcomes and recorded bond amounts changed around the period of an alleged November 2025 directive concerning immigration-judge bond adjudications.
3. The data show a substantial post-November 10 increase in bond amounts at Adelanto, consistent with a structural shift in bond-setting patterns. Among records with a positive recorded bond amount, the median increased from $7,500 before November 10, 2025 to $10,000 after November 10, and the mean increased from about $9,653 to $13,803. The distribution of recorded bond amounts also shifted upward: the share recorded at $5,000 fell from 20% to 13.9%, while the share recorded above $15,000 more than doubled, rising from 9.8% to 23.8%. Monthly trends show that the higher median persisted from November 2025 through April 30, 2026, the endpoint of the data analyzed, and the judge-level results show that all 11 IJs shown had higher mean recorded bond amounts after November 10, while 10 of 11 had higher medians. The data also show a post-November adverse shift in bond outcomes: denials as a share of completed bond records increased by 18.1 percentage points, from 39.3% to 57.4%, while the grant rate fell by 11.3 percentage points, from 37% to 25.7%. At the IJ level, denial shares increased for all 11 IJs shown. Exhibit B summarizes the core tables, figures, sensitivity checks, IJ-level patterns, and California detention-court context.

## METHODOLOGY

4. I analyzed the raw associated-bond table, D_TblAssociatedBond, from EOIR's publicly available case data files in the FOIA Library. I refer to these observations as "bond records" or "completed bond records," rather than as unique cases, because the raw table is organized at the bond-record level.

5. I filtered the data to records with base_city_code equal to ADL, corresponding to the Adelanto Immigration Court. Unless otherwise indicated, the analysis window is January 1, 2024 through April 30, 2026. I used comp_date as the completion-date field. The main comparison divides records into those completed before and after November 10, 2025.
6. I used November 10, 2025 as the primary empirical cutoff based on my review of bond-amount and outcome patterns around the period of the alleged November 2025 directive. I also tested nearby candidate cutoff dates to assess whether the observed patterns were sensitive to the precise November date selected.
7. I classified C, G, I, and R as grants; D, E, J, N, and S as denials; W as withdrawals; and all remaining decision codes as Other. Shares of all completed records use all completed bond records as the denominator. Grant and denial rates use only records classified as grants or denials, excluding withdrawals and Other outcomes. This restricted grant/denial denominator describes the adjudicated grant-versus-denial outcome mix and yields higher absolute rate levels than an all-record denominator. For transparency, I also report grants, denials, withdrawals, and Other outcomes as shares of all completed records where relevant.
8. I checked the decision-code mapping against the recorded bond-amount field. In the Adelanto data, C, G, and I were strongly associated with positive recorded bond amounts, while D, E, J, N, and S were rarely associated with positive recorded bond amounts. R-coded records were rare and less consistently associated with positive recorded bond amounts; excluding R from the grant category did not materially change the Adelanto results or the California detention-court comparison.
9. For bond-amount statistics, I used the new_bond field and limited the calculations to records with a non-missing bond amount greater than zero. These positive bond records generally correspond to grant-like outcomes, but they are not identical to grant-coded records because the EOIR bond-amount field is not always populated for every grant-coded record, and occasional non-grant records may contain a positive recorded bond amount.
10. I report statistical checks for selected comparisons. For differences in proportions, I used two-proportion tests. For the difference in mean recorded positive bond amounts, I calculated a large-sample z-statistic and confidence interval. These tests are descriptive checks of the observed administrative data.

## FINDINGS: ADELANTO OUTCOMES AND BOND AMOUNTS BEFORE AND AFTER NOVEMBER 10

11. From January 1, 2024 through April 30, 2026, I identified 8,555 completed Adelanto bond records. Of these, 4,445 were completed before November 10, 2025, and 4,110 were completed on or after November 10, 2025. Exh. B, Table 1.

### Bond Outcomes

12. After November 10, denials made up a much larger share of completed Adelanto bond records. The denial share increased by 18.1 percentage points, from 39.3% before November 10 to 57.4% after November 10. These shares correspond to 1,748 denials among 4,445 completed records before November 10 and 2,361 denials among 4,110 completed records after November 10. Exh. B, Table 1.

13. At the same time, grants became less common. The grant rate fell by 11.3 percentage points, from 37% before November 10 to 25.7% after November 10. The underlying counts moved in the same direction: grants fell from 1,027 to 816, even though the number of adjudicated outcomes increased from 2,775 to 3,177. Exh. B, Table 1. The two-week pattern around November 10 shows the same general decline, with lower grant rates in the post-November 10 periods than in the two pre-November periods shown. Exh. B, Figure 1.

14. Withdrawals also declined as a share of completed records, from 35.3% before November 10 to 20.3% after November 10—a 15.1 percentage-point decline. The monthly withdrawal share fluctuated after November 2025 but remained below the overall pre-November 10 share and was 16.3% in April 2026. I report this trend descriptively because multiple factors may have affected withdrawal patterns during this period. Exh. B, Tables 1 & 4. The denial-share increase, grant-rate decline, and withdrawal-share decline were each statistically significant in two-proportion tests. Exh. B, Table 1.

### Recorded Bond Amounts

15. Recorded bond amounts increased after November 10. Before November 10, there were 972 records with a positive recorded bond amount; after November 10, there were 756. Among those records, the median increased from $7,500 to $10,000, a $2,500 increase, or 33.3%. The mean increased from $9,653 to $13,803, a difference of approximately $4,150, or 43%. Exh. B, Table 2 & Figure 2. Because both the median and the mean increased, the change in bond amounts was not limited to a small number of high-value bonds.

16. The distribution of recorded bond amounts also shifted upward. The share recorded at $5,000 fell from 20% before November 10 to 13.9% after November 10, and the share recorded at $7,500 fell from 10.2% to 8.2%. By contrast, the share recorded at $10,000 increased from 15.7% to 22.8%, the share recorded at $15,000 nearly doubled, from 7.2% to 14%, and the share recorded above $15,000 more than doubled from 9.8% to 23.8%. Exh. B, Table 3. This distributional shift is consistent with a higher post-November bond-setting pattern.

17. Monthly trends show that the higher median persisted after November 2025. The monthly median recorded bond was $7,500 in July, August, September, and October 2025; moved to $10,000 in November 2025; and remained at $10,000 in each month from December 2025 through April 2026. Exh. B, Table 4. This sustained median of $10,000 is consistent with a structural shift in recorded bond amounts following the November period.

**FINDINGS: SENSITIVITY CHECKS**

18. I conducted two types of sensitivity checks. First, I tested whether the results depended on the exact November cutoff date. I reviewed weekly and local-period patterns and tested nearby candidate cutoffs, including the prior Monday, November 3; Monday, November 10; and later November dates around the alleged directive period: November 14, 17, and 18. The core bond-amount finding was materially unchanged using November 10, 14, 17, or 18: the median recorded bond increased from $7,500 to $10,000. November 3 did not show the same consistent shift in post-cutoff outcomes. I therefore used Monday, November 10, as the primary empirical cutoff for this study.

19. Second, I tested whether the findings depended on using the full January 1, 2024 through April 30, 2026 window. These alternative-window checks included a post-July 8, 2025 window; an equal-length pre/post window around November 10, 2025; and a shorter October 1, 2025 through January 31, 2026 local window. Exh. B, Tables 5–6.

20. The bond-amount finding was robust across these alternative windows. In each window, the median recorded bond was $7,500 before November 10 and $10,000 after November 10. The mean recorded bond also increased in each window, including by $3,403 in the equal-length pre/post window and $1,597 in the shorter October-to-January local window. Exh. B, Table 5. These checks support treating the increase in bond amounts as a robust post-November structural shift.

21. The outcome measures were directionally consistent. In each window, grant rates declined, and denials as a share of all completed records increased. Exh. B, Table 6. Unlike the bond-amount finding, the size of the outcome changes varied more

by window, consistent with some outcome deterioration occurring before November 10 and continuing afterward. Because other policy and case-composition changes occurred in 2025, I interpret the outcome sensitivity checks as supporting a broader post-November pattern, while treating the bond-amount increase as the more robust and stable finding.

**FINDINGS: JUDGE-LEVEL PATTERNS**

22. The judge-level results show a broad post-November increase in recorded bond amounts. The IJ-level table is based on IJ codes appearing in bond records coded as Adelanto Immigration Court records during the analysis period. Among the 11 IJs shown, all 11 had higher mean recorded bond amounts after November 10, and 10 of 11 had higher median recorded bond amounts. Several IJs with meaningful positive-bond counts in both periods had large median increases. For example, CGW's median recorded bond increased from $8,500 to $20,000, PDB's increased from $7,500 to $15,000, and RRH's increased from $7,500 to $15,000. Exh. B, Table 7.

23. The judge-level outcome patterns also generally moved in the same direction as the courtwide results. Denials as a share of all completed records increased for all 11 IJs. The largest increases included KGM, whose denial share rose by 44.5 percentage points; PDB, whose denial share rose by 23.1 percentage points; and VKB, whose denial share rose by 18 percentage points. Denial rates also increased for 8 of the 11 IJs shown. For example, WDN's denial rate rose by 24.9 percentage points, KGM's rose by 20.3 percentage points, and CGW's rose by 20.1 percentage points. Exh. B, Table 7. These judge-level patterns support the conclusion that the post-November outcome changes were not confined to one judge.

24. Taken together, the IJ-level table supports the broader courtwide pattern: after November 10, recorded bond amounts increased across the ADL-coded IJ records analyzed, while denial shares increased for every IJ shown and denial rates increased for most IJs shown.

**FINDINGS: CALIFORNIA DETENTION-COURT CONTEXT**

25. As descriptive context, I compared Adelanto with Imperial and Otay Mesa, the other California detention-facility immigration courts, as shown in Exhibit B. In the January 1, 2024 through April 30, 2026 analysis window, ADL, IMP, and OTM accounted for nearly all completed California bond records identified in D_TblAssociatedBond; other California court codes had no completed records or substantially smaller counts in that window. This comparison applies the same

November 10, 2025 cutoff and the same outcome-code classification to all three courts for descriptive purposes. It does not account for the possibility that Imperial and Otay Mesa had separate inflection dates or no detectable inflection in the data. The divergent patterns may reflect court-specific case composition, timing of directives, or other factors. Exh. B, Tables 8–9.

26. Adelanto showed the clearest post-November increase in recorded bond amounts. Adelanto was the only court in this comparison with both a higher mean and a higher median after November 10. Its median recorded bond increased from $7,500 to $10,000. By contrast, Imperial's median decreased from $3,000 to $2,500, and Otay Mesa's median decreased from $5,000 to $3,500. Exh. B, Table 8.

27. The outcome comparison also distinguishes Adelanto. Adelanto's grant rate declined by 11.3 percentage points under the November 10 cutoff, while Imperial's increased by 2.3 percentage points and Otay Mesa's increased by 11.6 percentage points. Adelanto also had the largest increase in denials as a share of completed records: +18.1 percentage points, compared with +3.9 percentage points at Imperial and +0.4 percentage points at Otay Mesa. Exh. B, Table 9.

**CONCLUSION**

28. The data are consistent with a structural post-November shift in recorded bond amounts at the Adelanto Immigration Court. Among records with a positive recorded bond amount, the median increased from $7,500 before November 10, 2025 to $10,000 after November 10, a $2,500 increase. The mean increased from approximately $9,653 to $13,803, a difference of approximately $4,150. The bond-amount distribution also shifted upward, with fewer $5,000 and $7,500 bonds and more bonds recorded at $10,000, $15,000, and above $15,000 after November 10; the share above $15,000 more than doubled, from 9.8% to 23.8%. The higher median persisted from November 2025 through April 30, 2026, the endpoint of the data analyzed, and the median increase was robust across the alternative analysis windows tested.

29. The outcome data also show a post-November adverse shift, though less stable in magnitude than the bond-amount increase. Denials as a share of completed Adelanto bond records increased by 18.1 percentage points after November 10, from 39.3% to 57.4%. The grant rate also fell by 11.3 percentage points, from 37% to 25.7%. The same directional pattern appeared in the shorter-window checks.

30. The judge-level and California detention-court comparisons provide additional context. Among the 11 IJs shown, all 11 had higher mean recorded bond amounts after November 10, and 10 of 11 had higher medians. Denials as a share of

completed records also increased for all 11 IJs, and denial rates increased for 8 of the 11. In the California detention-court comparison, Adelanto was the only court shown with both a higher mean and a higher median recorded bond amount under the same cutoff. Adelanto also had the only grant-rate decline and the largest increase in denials as a share of completed records among the three courts shown.

31. Taken together, the results support the conclusion that recorded bond amounts at Adelanto increased substantially and persistently after November 10, 2025, consistent with a structural shift in bond-setting patterns, while bond outcomes also shifted in a more adverse direction.

## INDEX OF EXHIBITS


| Exh. | Description | Page(s) |
|---|---|---|
| A | Curriculum Vitae of Zabdi J. Salazar | 1-2 |
| B | Adelanto Immigration Court Bond Outcomes and Bond Amounts | 3-8 |


I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 18, 2026, at Berkeley, CA.

Zabdi J. Salazar

Zabdi J. Salazar

# ZABDI SALAZAR

Berkeley, CA • 512-299-7294 • zsalazar2019@berkeley.edu

## EDUCATION

**University of California, Berkeley, School of Law,** Berkeley, CA
Ph.D. Candidate, Jurisprudence & Social Policy (Expected May 2027)
Juris Doctor, May 2024; State Bar of Texas, admitted October 2024

Dissertation: *The Administrative Ratchet: Executive Power and the Courts in U.S. Asylum Adjudication*
Committee: David Hausman (Co-Chair), Calvin Morrill (Co-Chair), Jennifer Chacon, Rachel Stern
Description: Three-article dissertation examining how executive intervention, deferred judicial review, and circuit-level appellate variation interact to shape asylum adjudication over time.

Field Examinations: Public Law (June 2021); Asylum and the Courts (Dec. 2023); Qualifying Exam (Sept. 2024)

Honors: Berkeley Law Dean's Fellowship; Berkeley Center for Law and Business Scholar; Chancellor's Fellowship for Graduate Study; JSP Cooter-Rubinfeld Fellowship

Methods & Training: ICPSR Summer Program (Modern Difference-in-Difference Designs, 2021; Funding Award); IQMR Certificate, 2021 (Funding Award)

Leadership & Service: *California Law Review*, Vol. 112 Managing Editor; J.D.-Ph.D. Joint Program Committee

**Trinity University,** San Antonio, TX
B.A., *summa cum laude*, in Political Science and Business Administration, May 2019 (Minors in Spanish and Economics)
Honors: Phi Beta Kappa, Beta Gamma Sigma, University Scholar (top 15 students in class)

## PROFESSIONAL EXPERIENCE

**U.S. District Court for the Southern District of Texas,** Houston, TX
Judicial Law Clerk to the Honorable Yvonne Ho — Sept. 2024–Sept. 2025
- Drafted memoranda and recommendations, memorandum opinions and orders, and routine civil orders.
- Conducted complex federal civil research and managed daily docket and motion practice.
- Coordinated closely with chambers staff on case administration and opinion production.

**EOIR, San Francisco Immigration Court,** San Francisco, CA
Law Student Extern — Aug. 2023–Dec. 2023
- Drafted a cancellation-of-removal merits order and an asylum decision involving a family-based PSG.
- Prepared oral decision outlines and credibility analyses; conducted asylum-law research; observed hearings.

**Berkeley Law: Asylum Law Practicum,** Berkeley, CA
Law Student Intern — Jan. 2023–May 2023
- Prepared an affirmative asylum application and letter brief for an Afghan family.
- Drafted detailed client declarations and compiled supporting country-conditions evidence.

**East Bay Community Law Center: Immigration Clinic,** Berkeley, CA
Law Student Intern — Aug. 2022–Dec. 2022
- Conducted general consultations with English- and Spanish-speaking clients regarding immigration-related legal issues and prepared legal documents for DACA renewal, DACA advance parole, and family-based petitions.
- Drafted an asylum brief for an applicant and worked with her to revise and update her declaration.

**U.S. District Court for the Southern District of Texas,** Laredo, TX
Judicial Extern to the Honorable Diana Song Quiroga — Jun. 2022–Jul. 2022

- Researched and drafted memos and orders on civil and immigration-related issues, including alternatives to detention, U-visa certification, hearsay in revocation proceedings, and bond and revocation matters.
- Revised filings in civil discovery disputes, assisted with model rules on court performance standards, and observed daily hearings.

## ACADEMIC EXPERIENCE

**University of California, Berkeley, School of Law,** Berkeley, CA — Sept. 2023–May 2024
Research Assistant to Professor David Hausman (Immigration Law)

- Conducted empirical research supporting a Central America–U.S. migration estimation model, integrating multi-source administrative data (CBP, INM, COMAR), evaluating recidivism and detection assumptions under Title 8 and Title 42, and compiling cross-national demographic and economic indicators to contextualize regional emigration trends.
- Compiled and synthesized post-2019 federal appellate and district court decisions interpreting 8 U.S.C. § 1252(b)(9), analyzing the scope of jurisdiction-channeling and the treatment of collateral constitutional claims in removal-related litigation.

**University of California, Berkeley,** Berkeley, CA
Graduate Student Instructor — Aug. 2020–May 2021

- Planned and delivered lessons for weekly undergraduate discussion sections for two courses: Immigration & Citizenship and Membership & Migration - Empirical and Normative Perspectives.
- Graded assignments, research papers, and exams. Held weekly office hours and review sessions.

## SELECTED PUBLICATIONS AND PRESENTATIONS

- Salazar, Z. "The Executive Pinch: When Executive Power Outruns Judicial Review in Administrative Adjudication." Manuscript in preparation.
- "Immigration Judges & Bureaucracy: The Impact of Case Quotas," *presented at the Berkeley Empirical Legal Studies Fellow Workshop, Center for the Study of Law and Society, Mar. 2, 2023.*
- "The Evolution of the Particular Social Group (PSG) and Domestic Violence Asylum Claims," *presented at the Graduate Seminar Series, UC Davis Global Migration Center, Apr. 30, 2020.*
- Salazar, Z. "Paradoxes of Gender Equality Policies and Domestic Working Conditions in Madrid," *Claremont-UC Undergraduate Research Conference on the European Union Journal*. Vol. 2018, Article 11. Web. Oct. 9, 2018. https://scholarship.claremont.edu/urceu/vol2018/iss1/11

## SELECTED AWARDS AND HONORS

| | |
|---|---|
| JSP Cooter-Rubinfeld Fellowship, UC Berkeley | Aug. 2026–Dec. 2026 |
| D-Lab AI Latinx Fellow, UC Berkeley | Jan. 2026–May 2026 |
| Social Sciences Research Pathways Graduate Mentor, IRLE | Sept. 2025–May 2026 |
| Teressa K. Lippert Distinguished Service Award (*California Law Review*) | May 2024 |
| BELS Fellow (Berkeley Empirical Legal Studies) | Aug. 2022–May 2023 |
| LEAP Fellow (Berkeley Law, Economics, and Politics Center) | Aug. 2022–May 2023 |
| IRLE Graduate Student Research Award (Institute for Research of Labor and Employment) | Jun. 2021 |
| Prosser Prize in Forced Migration | Dec. 2022 |

## SKILLS

**Software:** R; RMarkdown; Git/GitHub; LaTeX; VS Code; command line tools
**Languages:** Spanish (Native), French (Intermediate)

# Exhibit B. Adelanto Immigration Court Bond Outcomes and Bond Amounts

These tables and figures summarize Adelanto Immigration Court bond outcomes and recorded bond amounts before and after November 10, 2025. Section I presents the core Adelanto outcome and bond-amount statistics, including corresponding grant-rate and bond-amount figures. Section II reports sensitivity checks using alternative analysis windows. Section III summarizes IJ-level patterns. Section IV provides descriptive context comparing Adelanto with other California detention-facility immigration courts.

*Note: Unless stated otherwise, the analysis window is Jan. 1, 2024–Apr. 30, 2026; Nov. 10, 2025 is the cutoff, with records on or after that date treated as post-cutoff. Grant/denial rates exclude withdrawals and Other outcomes; bond-amount statistics use only positive recorded bond amounts. Percentages are rounded; pp changes use unrounded values.*

## I. Core Adelanto Bond Outcomes and Bond Amount Changes

### Table 1. Adelanto Bond Outcomes Before and After Nov. 10, 2025

| Metric | Before Nov. 10 | After Nov. 10 | Change |
|---|---|---|---|
| Total completed bond records | 4,445 | 4,110 | — |
| Grants as share of all completed records | 23.1% (1,027/4,445) | 19.9% (816/4,110) | -3.3 pp* |
| Denials as share of all completed records | **39.3%** (1,748/4,445) | **57.4%** (2,361/4,110) | **+18.1 pp*** |
| Withdrawals as share of all completed records | **35.3%** (1,570/4,445) | **20.3%** (833/4,110) | **-15.1 pp*** |
| Other outcomes as share of all completed records | 2.2% (100/4,445) | 2.4% (100/4,110) | +0.2 pp |
| Grant rate among grant/denial outcomes | **37.0%** (1,027/2,775) | **25.7%** (816/3,177) | **-11.3 pp*** |

Key point: After November 10, denials increased from 39.3% to 57.4% of all completed bond records, while the grant rate fell from 37% to 25.7%. Withdrawals also declined substantially as a share of completed records.

*Note: An asterisk indicates $p < 0.05$ from a two-proportion test. Shares use all completed Adelanto bond records; grant rates use only grant/denial outcomes and exclude withdrawals and Other outcomes.*

### Figure 1. Adelanto Bond Grant Rates in Two-Week Periods Around Nov. 10, 2025




Key point: The two-week grant-rate pattern shows lower grant rates in the post-November 10 periods than in the two pre-November periods shown.

*Note: Grant rates exclude withdrawals and Other outcomes.*

**Table 2. Adelanto Recorded Positive Bond Amounts Before and After Nov. 10, 2025**

| Metric | Before Nov. 10 | After Nov. 10 | Change |
|---|---|---|---|
| Records with recorded positive bond amount | 972 | 756 | — |
| Share | 21.9% (972/4,445) | 18.4% (756/4,110) | -3.5 pp |
| Mean | **$9,653** | **$13,803** | **$4,150 (+43.0%)** |
| Median | **$7,500** | **$10,000** | **$2,500 (+33.3%)** |
| Bond standard deviation | $12,166 | $11,977 | — |
| Z-score, raw positive bonds | — | — | 7.095 |
| 95% CI for mean increase | — | — | $3,003 to $5,296 |
| P-value, raw positive bonds | — | — | <0.001 |
| Statistically significant at $p < 0.05$ | — | — | Yes |

Key point: Both typical and average bond amounts increased after November 10. The median increased from $7,500 to $10,000, a $2,500 increase, while the mean increased from $9,653 to $13,803, a difference of approximately $4,150. The mean increase was statistically significant in the reported statistical check.

*Note: Bond-amount statistics are calculated among records with a positive recorded bond amount. The z-score, confidence interval, and p-value are statistical tests of the difference in the mean recorded positive bond amounts.*

**Figure 2. Mean and Median Recorded Positive Bond Amounts Before and After Nov. 10, 2025**




Key point: Bond amounts increased in both mean and median after November 10, 2025.

*Note: Mean and median are calculated among records with a positive recorded bond amount.*

**Table 3. Selected Adelanto Recorded Positive Bond Amounts Before and After Nov. 10, 2025**

| Bond Amount | Before Nov. 10 (n=972) | After Nov. 10 (n=756) |
|---|---|---|
| $5,000 | 194 (20.0%) | 105 (13.9%) |
| $7,500 | 99 (10.2%) | 62 (8.2%) |
| $10,000 | 153 (15.7%) | 172 (22.8%) |
| $15,000 | 70 (7.2%) | 106 (14.0%) |
| > $15,000 | 95 (9.8%) | 180 (23.8%) |

Key point: Among selected common bond amounts and the upper-tail category, the distribution shifted upward after November 10. The share of positive bonds recorded at $5,000 and $7,500 declined, while the share recorded at $10,000, $15,000, and above $15,000 increased. The largest shift was in bonds above $15,000, which increased from 9.8% to 23.8% of recorded positive bonds.

*Note: Percentages are calculated among all records with a positive recorded bond amount in each period: 972 records before November 10, 2025, and 756 records after November 10, 2025. Rows do not sum to the period totals because this table reports selected common bond amounts and the upper-tail category above $15,000; other positive bond amounts are not shown.*

**Table 4. Monthly Adelanto Bond Outcomes and Recorded Bond Amounts, June 2025-April 2026**

| Month | Completed Records (n) | Bond Outcomes (n) | Grant Rate | Denial Share of All Records | Withdrawal Share of All Records | Bond Records (n) | Mean Bond | Median Bond |
|---|---|---|---|---|---|---|---|---|
| Jun. 2025 | 274 | 163 | 49.1% | 30.3% | 39.1% | 79 | $11,386 | $10,000 |
| Jul. 2025 | 586 | 398 | 46.5% | 36.3% | 30.7% | 178 | $9,966 | $7,500 |
| Aug. 2025 | 550 | 375 | 24.3% | 51.6% | 30.7% | 85 | $9,841 | $7,500 |
| Sep. 2025 | 426 | 266 | 21.8% | 48.8% | 35.2% | 55 | $8,836 | $7,500 |
| Oct. 2025 | 337 | 231 | 32.5% | 46.3% | 29.1% | 64 | $13,594 | $7,500 |
| **Nov. 2025*** | **368** | **286** | **35.3%** | **50.3%** | **20.4%** | **81** | **$11,574** | **$10,000** |
| Dec. 2025 | 773 | 596 | 25.0% | 57.8% | 20.6% | 139 | $13,432 | $10,000 |
| Jan. 2026 | 700 | 518 | 22.6% | 57.3% | 24.4% | 112 | $14,004 | $10,000 |
| Feb. 2026 | 698 | 551 | 27.2% | 57.4% | 17.3% | 143 | $14,042 | $10,000 |
| Mar. 2026 | 896 | 674 | 27.0% | 54.9% | 22.9% | 169 | $13,015 | $10,000 |
| Apr. 2026 | 768 | 622 | 23.3% | 62.1% | 16.3% | 138 | $14,964 | $10,000 |

Key point: The monthly median bond amounts rose to $10,000 in November 2025 and remained at $10,000 in each subsequent month shown. The monthly outcome measures show a more gradual pattern: grant rates had already declined in August and September 2025, rebounded somewhat in October and November, and then remained lower from December 2025 through April 2026.

*Note: November 2025 is marked with an asterisk because it includes dates before and after the November 10 cutoff. Grant rates are calculated among records classified as grants or denials. Denial and withdrawal shares use all completed bond records as the denominator. Bond amount statistics are calculated only among records with a positive recorded bond amount.*

## II. Sensitivity Checks

**Table 5. Bond Amounts Before and After Nov. 10, 2025, Alternative Analysis Windows**

| Analysis Window | Positive Bond Records Before / After (n) | Median Bond Before | Median Bond After | Median Change | Mean Bond Before | Mean Bond After | Mean Change |
|---|---|---|---|---|---|---|---|
| 1/1/24–4/30/26 (Main) | 972 / 756 | $7,500 | $10,000 | $2,500 | $9,653 | $13,803 | $4,150 |
| 7/8/25–4/30/26 | 351 / 756 | $7,500 | $10,000 | $2,500 | $10,470 | $13,803 | $3,333 |
| 5/22/25–4/30/26 | 496 / 756 | $7,500 | $10,000 | $2,500 | $10,400 | $13,803 | $3,403 |
| 10/1/25–1/31/26 | 90 / 306 | $7,500 | $10,000 | $2,500 | $12,006 | $13,603 | $1,597 |

Key point: The bond-amount finding is robust across alternative windows. In each window shown, the median bond amount increased from $7,500 before November 10 to $10,000 after November 10.

*Note: The 5/22/25–4/30/26 window uses the same number of days before and after November 10. Bond amount statistics use only records with a positive recorded bond amount.*

**Table 6. Outcome Measures Before and After Nov. 10, 2025, Alternative Analysis Windows**

| Analysis Window | Grant/Denial Outcomes Before / After (n) | Grants (n) | Denials (n) | Grant Rate | Grant Rate Change | Denial Share of All Records | Denial Share Change |
|---|---|---|---|---|---|---|---|
| 1/1/24–4/30/26 (Main) | 2,775 / 3,177 | 1,027 / 816 | 1,748 / 2,361 | 37.0% / 25.7% | -11.3 pp | 39.3% / 57.4% | +18.1 pp |
| 7/8/25–4/30/26 | 1,263 / 3,177 | 377 / 816 | 886 / 2,361 | 29.8% / 25.7% | -4.2 pp | 47.1% / 57.4% | +10.4 pp |
| 5/22/25–4/30/26 | 1,534 / 3,177 | 526 / 816 | 1,008 / 2,361 | 34.3% / 25.7% | -8.6 pp | 43.5% / 57.4% | +13.9 pp |
| 10/1/25–1/31/26 | 301 / 1,330 | 103 / 339 | 198 / 991 | 34.2% / 25.5% | -8.7 pp | 46.0% / 56.7% | +10.6 pp |

Key point: Outcome changes were directionally consistent across alternative windows. Grant rates declined in each window, while denials as a share of all completed records increased in each window.

*Note: Grant-rate changes use grant-or-denial outcomes as the denominator. Denial-share changes use all completed bond records as the denominator, including grants, denials, withdrawals, and Other outcomes. The 5/22/25–4/30/26 window uses the same number of days before and after November 10.*

### III. Judge-Level Patterns

**Table 7. Per-Judge Adelanto Bond Outcome and Amount Changes Before and After Nov. 10, 2025**

| IJ Code | Grant/Denial Outcomes Before / After (n) | Denial Rate | Denial Share of All Records | Positive Bond Records (n) | Mean Recorded Positive Bond | Median Recorded Positive Bond |
|---|---|---|---|---|---|---|
| BDP | 479 / 198 | 63.5% / 78.8% (+15.3 pp) | 37.9% / 54.2% (+16.3 pp) | 169 / 39 | $11,609 / $14,231 (+22.6%) | $7,500 / $10,000 (+$2,500) |
| CEM | 251 / 358 | 54.6% / 66.8% (+12.2 pp) | 31.9% / 45.7% (+13.8 pp) | 106 / 104 | $9,627 / $11,736 (+21.9%) | $7,500 / $10,000 (+$2,500) |
| CGW | 619 / 263 | 62.0% / 82.1% (+20.1 pp) | 43.1% / 60.8% (+17.7 pp) | 219 / 47 | $9,413 / $21,000 (+123.1%) | $8,500 / $20,000 (+$11,500) |
| JER | 33 / 159 | 87.9% / 84.9% (-3.0 pp) | 60.4% / 74.2% (+13.8 pp) | 3 / 21 | $3,333 / $5,429 (+62.9%) | $3,000 / $5,000 (+$2,000) |
| KGM | 284 / 295 | 73.2% / 93.6% (+20.3 pp) | 42.9% / 87.3% (+44.5 pp) | 73 / 19 | $7,973 / $15,553 (+95.1%) | $5,000 / $10,000 (+$5,000) |
| MWC | 108 / 308 | 71.3% / 70.1% (-1.2 pp) | 47.0% / 53.3% (+6.4 pp) | 20 / 86 | $14,000 / $20,070 (+43.4%) | $10,500 / $17,500 (+$7,000) |
| PDB | 344 / 214 | 75.9% / 85.0% (+9.2 pp) | 42.4% / 65.5% (+23.1 pp) | 82 / 31 | $8,256 / $18,823 (+128.0%) | $7,500 / $15,000 (+$7,500) |
| PNM | 59 / 70 | 83.1% / 90.0% (+6.9 pp) | 47.6% / 54.3% (+6.7 pp) | 10 / 6 | $8,050 / $18,333 (+127.7%) | $7,000 / $12,500 (+$5,500) |
| RRH | 239 / 307 | 77.8% / 76.5% (-1.3 pp) | 54.4% / 60.7% (+6.3 pp) | 52 / 68 | $10,394 / $14,699 (+41.4%) | $7,500 / $15,000 (+$7,500) |
| VKB | 26 / 305 | 42.3% / 58.7% (+16.4 pp) | 33.3% / 51.3% (+18.0 pp) | 15 / 110 | $8,267 / $10,450 (+26.4%) | $7,500 / $7,500 ($0) |
| WDN | 214 / 163 | 15.0% / 39.9% (+24.9 pp) | 8.5% / 25.7% (+17.2 pp) | 178 / 92 | $8,520 / $12,549 (+47.3%) | $7,500 / $10,000 (+$2,500) |

Key point: At the IJ level, the post-November bond-amount increase was widespread. Among the 11 IJs shown, all 11 had higher mean recorded positive bond amounts after November 10, and 10 of 11 had higher median recorded positive bond amounts. Denials as a share of all completed records increased for all 11 IJs shown; denial rates among grant/denial outcomes increased for 8 of the 11 IJs.

*Note: The table includes IJ codes appearing in ADL-coded bond records during the January 1, 2024 through April 30, 2026 analysis window, limited to IJs with at least 25 completed bond records in both periods and at least one recorded positive bond amount in both periods. The IJ codes reflect bond records coded to the Adelanto Immigration Court during the study period and should not be read as a current Adelanto IJ roster. "Denial Rate" uses only records classified as grants or denials as the denominator; "Denial Share of All Records" uses all completed bond records as the denominator. Mean and median bond amounts are calculated only among records with a positive recorded bond amount.*

## IV. California Detention-Court Context

This comparison is limited to the California detention-facility courts shown. In the January 1, 2024 through April 30, 2026 analysis window, ADL, IMP, and OTM accounted for 14,741 of 14,767 completed California bond records identified in D_TblAssociatedBond, or approximately 99.8%. Other California court codes had no completed records or substantially smaller counts in that window. The comparison applies the same November 10, 2025 cutoff to ADL, IMP, and OTM for descriptive purposes and does not test whether other courts had separate inflection points.

**Table 8. California Detention-Court Bond Amounts Before and After Nov. 10, 2025**

| Court | Positive Bond Records Before / After (n) | Mean Bond Before | Mean Bond After | Mean Change | Median Bond Before | Median Bond After | Median Change |
|---|---|---|---|---|---|---|---|
| Adelanto (ADL) | 972 / 756 | $9,653 | $13,803 | +$4,150 (+43.0%) | $7,500 | $10,000 | +$2,500 (+33.3%) |
| Imperial (IMP) | 282 / 295 | $4,023 | $5,593 | +$1,570 (+39.0%) | $3,000 | $2,500 | -$500 (-16.7%) |
| Otay Mesa (OTM) | 746 / 710 | $5,621 | $5,570 | -$52 (-0.9%) | $5,000 | $3,500 | -$1,500 (-30.0%) |

Key point: As descriptive context, Adelanto was the only California detention-facility court in this comparison with both a higher mean and a higher median recorded bond amount after November 10. Imperial and Otay Mesa had lower post-November median recorded bond amounts under the same cutoff.

*Note: Bond amount statistics are calculated only among records with a positive recorded bond amount.*

**Table 9. California Detention-Court Bond Outcomes Before and After Nov. 10, 2025**

| Court | Total Records Before / After (n) | Grant/Denial Outcomes Before / After (n) | Grant Rate | Denial Share of All Records | Withdrawal Share of All Records |
|---|---|---|---|---|---|
| Adelanto (ADL) | 4,445 / 4,110 | 2,775 / 3,177 | 37.0% / 25.7% (-11.3 pp) | 39.3% / 57.4% (+18.1 pp) | 35.3% / 20.3% (-15.1 pp) |
| Imperial (IMP) | 940 / 817 | 634 / 637 | 46.2% / 48.5% (+2.3 pp) | 36.3% / 40.1% (+3.9 pp) | 32.0% / 20.4% (-11.6 pp) |
| Otay Mesa (OTM) | 2,784 / 1,645 | 1,753 / 1,321 | 43.6% / 55.3% (+11.6 pp) | 35.5% / 35.9% (+0.4 pp) | 33.3% / 16.6% (-16.7 pp) |

Key point: Adelanto showed a distinct outcome pattern under the November 10 cutoff. Adelanto’s grant rate declined by 11.3 percentage points, while Imperial’s and Otay Mesa’s grant rates increased. Adelanto also had the largest increase in denial share of all completed records.

*Note: Grant rates are calculated among records classified as grants or denials. Denial and withdrawal shares use all completed bond records as the denominator.*